The three cases on the calendar this morning have been consolidated for argument and we appreciate the parties cooperation in that regard. The cases are 161327 Zond v. Gillette, 161393 Zond v. Advanced Micro Devices, and 161423 Zond v. Advanced Micro Devices. Sir, whenever you're ready. Morning, Your Honors. My name is Tarek Fahmy. I'm here representing the patent owner Zond. May it please the Court. Your Honors, beginning with the IPRs involving the 155 and 184 patents, the Board's decisions take claim language that contains no ambiguity without forming an argument, and introduces uncertainty, substantially eliminating the possibility of argument. And that uncertainty exists where there should be none. Well, I understand what you're saying, that your view of it is this falls into the box where we say there's clear and ordinary meaning, there's clearly an understanding. But doesn't the expert testimony that came in in this case demonstrate that there is no clear meaning of this term is not, is substantially, as the Board concluded, and not entirely? I don't think so, Your Honor. What the expert testimony indicated was that the patent teaches that when the weakly ionized plasma is formed, there's a, quote, substantial elimination of the possibility of arcing. That's not disputed. But the claims go further, and the patent actually teaches a further embodiment where the arcing is eliminated during the formation of the strongly ionized plasma. And I would invite the Court's attention to, for example, the 155 patent, column 4, lines 8 through 10, the pulsed power supply, 102, can include circuitry that minimizes or eliminates the probability of arcing in the chamber. Now... But all you're doing is repeating the language of the claim. And the question is, how to read the language of the claim in the light of the reality of the science to which your expert testified. As I understand it, you are now saying that we're talking about the pulse that creates the strongly ionized plasma. And it's only dealing with that instant in time, rather than during the entire process. And you've asserted that the testimony about the inevitability of arcing only is addressed to the entire process. I don't think that's true. I think there is, in fact, pretty clear testimony that even at the moment that the pulse creates the strongly ionized plasma, that there is arcing. Not in every instance, but that there are times when you can avoid it and there are times when it's not avoidable. So if you were, even under your view, if you were to construe these claims as saying it covers a situation where the pulse does not create arcing, that, according to the testimony, is also true with respect to the prior arcing reference. In other words, that in both instances, at the moment of creation, there is sometimes arcing and there is sometimes not. So how can you avoid weighing under those circumstances? Your Honor, the claims don't recite a situation in which every possible instance of arcing is eliminated. That's never been the patent owner's position. The claims recite something... And it doesn't even eliminate the possibility of arcing at the time of the creation of the strongly ionized plasma, because it's not possible to eliminate that in all instances, correct? I don't know that there was evidence on that point, Your Honor, but the claims are not directed to every instance. No, no, no, no, no. Please answer my question. I'm not a plasma physicist, Your Honor. Based on my understanding... The testimony that I've read says pretty clearly, both by your expert and otherwise, that it is not possible to uniformly avoid arcing at the moment of the testimony. And allow me to explain. If arcing occurs, the plasma never comes into existence. It's that simple. I don't read the testimony that way, but let's assume that I'm correct as to what the testimony says. Then why isn't weighing anticipatory? Because the claim recites characteristics of a voltage pulse that have to be adhered to in order to achieve this elimination of arcing at the transition between the weakly ionized plasma and the strongly ionized plasma. Now, for one, weighing doesn't speak to control of a voltage pulse. Weighing is discussing the application of power. And so the testimony in the record from Mr. DeVito indicates that when you are controlling power, you are not controlling voltage. That's a different argument, right? No, Your Honor. That's the argument that Zond has been making from the outset, is that the claims are narrowly focused on, quote, a voltage pulse having at least one of a controlled amplitude and a controlled rise time that increases the ionization rate in order to form the strongly ionized plasma so it forms without an arc. It's control of the voltage pulse. It's not control over every possible source of arcing that might occur in the chamber. We've agreed to, except your view is But the claim doesn't speak to that. The board had the same misinterpretation of the argument. The board apparently thought that we were trying to argue what I think my learning colleague has characterized as an absolutist construction in which every possible contingency of arcing has to be The argument only ever was that there was certain controls placed on the voltage pulse as described in the specification and as shown in many of the diagrams of the patent, figures I think 4 through 7B, provide many examples of the kinds of pulses that could be used to achieve this effect. Somehow the board read this as the idea that, oh no, Zond is suggesting that the claim requires absolutely no arcing from any circumstance. But that simply was never the case. It's not the case before this court. Your honors, the specification, again I'm going to refer to the 155 patent, but the 184 shares the same specification. Specification indicates that... You want to give us a site for the specification? Yes, your honor. 155 patent, column 6, lines 11 through 12, indicates the power supply can be programmed to generate pulses having various shapes. And then consistent with the testimony of Dr. Hartzell, there are many examples of the shapes of those voltage pulses, each having the claimed attributes of the controlled amplitude and the controlled rise time. That is what the claims are directed to, your honors. The programming of the power supply allows control over the rate at which the energy is delivered into the plasma, that's controlled the rise time, controlled magnitude, and thereby achieves the elimination of the arcing that's recited in the claims. As I mentioned, the claim speaks to two different... Excuse me, the specification speaks to two different embodiments. Those that may minimize the probability of arcing and those that eliminate it. And the use of the word or here is important because it signals the introductions of alternative embodiments. In fact, the example or the embodiment in which arcing may only be minimized is given, for example, again, 155 patent, column 20, lines 36 through 37. By controlling the size of the gap between the cathode and the anode, arcing can be minimized. And so that's a separate embodiment. That's an embodiment, but what seems to have concerned the board is that what is claimed is the result and that the details of how the result is achieved are not limited in the claims. I would suggest, Your Honor, that the result certainly is recited, but how it's achieved is specified through the control of the amplitude and the rise time. And that is, in fact, how the figures are drawn to show that control over time. And so I think those are the means by which... It was known that you need to avoid an electrical breakdown. Yes, it was known. So a claim that says whatever avoids electrical breakdown is claimed or is novel, that does seem to raise questions of the differences, the distinctions from what's already been known, which is really a matter of the breadth of the claim, is it not? Well, I agree the breadth of the claim is certainly at issue, Your Honor. I don't think it's as broad as you're suggesting. I don't think it's any mechanism by which you might avoid formation of an arc. It's specific about the voltage pulse and it's specific about which parameters of the voltage pulse are controlled. Electrical pulse was not novel, was it, for this technology? In the abstract, no. That's how plasmas are created. It's through electrical pulses. I'm just looking, for instance, assuming that the Russian dissertation is prior art, considers the pulse. So you're speaking to a different set of claims, Your Honor. The Moskvin thesis was not a basis for finding claims unpatentable with respect to the 155 that I've been speaking to. You're speaking to the 421 and 773 patents. So how about moving on to those that Judge Newman was referring to? Certainly, Your Honor. The claims in the 421 patent, at least the independent claims, were found anticipated by Wang. And so the Moskvin thesis was actually not used in finding those claims unpatentable. The Moskvin thesis really only comes into play when we're dealing with some of the dependent claims in 423. And the one claim of 773, claim 2. You said 423, you mean 421? I beg your pardon, 421. It would be claims 14, 26, and 37 of 421 and claim 2 of 773. Certainly the thesis speaks to use of electrical pulses to create plasmas, yes. Yes, to understand the state of the art at the time, the initial priority of Zahn's applications. Yes, it was known to use electrical pulses to create plasmas, Your Honor. That's never been in dispute. What is in dispute is the particular kind of control that's exercised in order to eliminate the possibility of arcing and strongly ionized plasma is created. Judge Proceed, you'd asked me to speak to the Moskvin thesis, and I'm more than happy to. The contention with respect to the thesis... There's no question that there was substantial evidence to support the notion that the thesis existed in 1994, right? Its existence has never been disputed, Your Honor, no. The fact that it existed has not been disputed. What was disputed was whether it was publicly accessible for purposes of the patent statute. And there's no dispute that if it was on the Russian State Library website that it was publicly accessible, right? Had it been so, yes, it would have been publicly accessible. But there was no evidence that that website even existed at the time of the invention. That webpage printout was a printout from 2014, I believe. And there was no evidence that the catalog existed at the time of the invention. In fact, this is something that Judge Stevens noted in her dissent. Well, it says since 1995, so isn't that evidence that the website existed as of 1995? I don't think it is at all, Your Honor. I think it merely says that this is a list of documents since 1995. It says nothing about when the list was created. It certainly says nothing about when the list was posted to the Internet. It says nothing about when the list was made available to anyone in any form. It's simply a list. And if we think back to 1995, we're dealing in dial-up modem days, 14-4 modems, pre-Google. We were using AltaVista probably as a search engine. Most people's familiarity with the Internet was AOL. There's no evidence in the record that this kind of a catalog, and in fact this catalog in particular, was available on the Internet in those days. Well, there's a six-year period, though, right? Yes. Before the priority date. Yes. However, again, in the absence of evidence, it would be just speculation to say when that list became available. And this court's Lister decision speaks to those types of issues. And I believe Lister can be read as standing for the proposition that in absence of evidence of that public listings date, the disclosures on the Internet or some online database cannot be relied upon as prior art. Now, Lister, there was just a two-year period, right? I believe that's correct, Your Honor. But the operative part of the decision, as I understand it, was that the court recognized that the manuscript Dr. Lister had created existed. It had a copyright stamp. He had registered the manuscript in the Copyright Office. But while the copyright date might show its existence, it said nothing to its dissemination. The court looked to, in fact, the dissemination in the Westlaw and the Dialog databases, perhaps akin to posting on an Internet. But because there wasn't any evidence in the record about when those postings occurred or the process used by Westlaw or Dialog to incorporate the Copyright Office records, then one could not say that the manuscript had became publicly available prior to the critical date of the patent. The other thing that Judge Stevens noted in her dissent was, as I mentioned, that there was no evidence concerning when the catalog even existed. And so there's nothing that indicates the catalog would have been available at the time of the invention. Your Honors, earlier Judge Dyke mentioned testimony from Zahn's expert, Dr. Hartzell. And I would just remind the court that the passage that's being referred to in my colleague's papers is dealing with a one-word answer to a very limited question. The one word is no, right? He says no, that there's no way to eliminate the probability of arcing 100% of the time. That was the answer to the question. Can you give me the site on that appendix? Yes, Your Honor. This is in the appendix with respect to the 716 patent. It's page 1663. It appears in others of the appendices as well. That just happens to be the one that I have handy. Got it. But he goes on immediately thereafter and says essentially, look, your question is asking about every possible instance of forming an arc, and that's not what the claim is about. The claim's directed to conditions that prevent plasma from forming as an arc as it forms. Yeah, but there's other testimony at page 198, 99 of the same transcript. So in order to meet the claim, would you have to eliminate arcing 100% of the time during the formation of the strongly ionized plasma? And he says if you're forming an arc, it's possible that an arc could occur, as I've mentioned. And then he goes on to say that even in Wang, we can agree that sometimes arcing will occur and sometimes it won't. He says that's right. And he says that in instances where Wang does not have arcing, does it meet the claim phrase without forming an arc? And your witness said it doesn't form an arc. So he seems to agree that arcing sometimes is going to occur even under the patented device and method and that sometimes arcing is not going to occur in Wang. So what's the difference between the two? So I think I know I'm into the rebuttal time, Your Honor, but let me answer your question. I think the first portion of the quote that you read from Dr. Hartzau is consistent with the section that I pointed to in that there was never any assertion that all possible arcing is eliminated all of the time. No, but the quote that I read is directed to the point of formation of the strongly ionized plasma. Yes, and as I mentioned at the outset, even during the formation, the claim only speaks to the application of the voltage pulse and not all possible circumstances for arcing that might exist. And I think the testimony is consistent with that point. And as to the idea that sometimes there may be instances in Wang where arcs are not formed, if we accept that as true, Dr. Hartzau says it's true, Wang still doesn't meet the requirements of the claim. For example, Wang controls power, not voltage, and even the figure six embodiment of Wang is incomplete insofar as the 421 and 773 patterns are concerned. Well, that seems to be your argument now, that Wang doesn't anticipate because it's controlling power, not voltage. But I'm not sure there's a difference. Is there really? There is, and Mr. DeVito says there is, and Wang says there is. Mr. DeVito testified that when one controls power, voltage initially shoots up. It's an uncontrolled state because the current has yet to be established through the plasma. So when one controls power, voltage is uncontrolled. What did the commission, what did the PTO say about that? I don't recall the board directly addressing that portion of Mr. DeVito's testimony at all, Your Honor. You are correct. You are into your rebuttal. So why don't we save the remainder and hear from the other side. Thank you. Thank you. Good morning. My name is Mark Matushak. It may please the court, and I represent the Appley Gillette Company. I'll be presenting argument today on behalf of all of the appellees in all of the appeals for this case. Why don't you address that last point about how supposedly there's a different mechanism in Wang for creating the pulse that avoids arcing? Well, Zahn argued that to the board. The board had the expert testimony in front of them, and the expert testimony was inconsistent with that argument. The board credited the testimony of Dr. Brofman. What page is this? This is in the 1327 appendix at 25. It's the board's decision. The actual number, not the appendix site, is 25? It's the actual, it's in the appendix. Yeah, the appendix number at the bottom. 5 2 9 9? 25. It's the paragraph again also? Yes. Yes. The board credited Dr. Brofman's testimony that says to generate a power pulse, the power supply first comprises a voltage pulse with a specific amplitude and rise time. And the board credited Mr. DeVito at the same spot saying, Wang discloses a pulse DC power supply connected to the target that produces a train of negative voltage pulses. And they likewise credited Mr. DeVito's testimony that the application of those voltage pulses is what produces the peak power pulses in Wang. So this is a factual argument about what the scope of the prior art shows. The board had significant and substantial evidence on which it could rely for that conclusion. So I think the board properly reached the conclusion that Wang does show a voltage pulse. Now, it's interesting that we've heard this warning and in the reply brief for the first time, Zahn's argument that, well, they don't say that you can never have arcing at all during the process. It's just in the formation of the strongly ionized plasma. It's just with respect to the voltage pulse. But in its initial brief and before the board, Zahn argued that the claims of the patents, quote, should be construed as requiring formation of a strongly ionized plasma in the absence of forming an arc. No reference to control of the amplitude and the rise time. That position is repeated at least four other times in their brief. One example is on page 23. Well, they're saying that you should read the claim as saying there's no arcing at the time the pulse creates the strongly ionized plasma. But that's not what they argued to the board. Well, let's put that aside. All right. It's also incorrect. You can't interrupt me. I'm sorry. You cannot do that. It seems to me that even if you're talking about the instance in which the strongly ionized plasma is created, there's testimony that there's sometimes arcing and sometimes not under the patented device and method, and that the same thing is said about Wang, that sometimes you can avoid arcing and sometimes not. So it's hard for me to see why that isn't anticipatory. I agree that it is. I think, as Your Honor points out and mentioned earlier, all of the expert testimony before the board was consistent on this point. Dr. Hartsaw testified, and I think we've seen one example in the record that Your Honor identified, but there are at least two others where he said, quote, you can't say that an arc would never occur in a system practicing this invention. He said, and if you're, quote, if you're forming a strongly ionized plasma, you know it's possible that an arc could occur. And, quote, you can't guarantee that an arc will never occur. And he even said the reason why that was true, because arcing, as he said, is, quote, often a probabilistic thing. Our expert, Applebee's expert, Dr. Portshagen testified the same way. He said the probability of arcing can never be completely eliminated in a realistic sputtering system. There's always a chance that a local electron density can become sufficiently high to create a short circuit and result in an arc discharge. Applebee's expert, Dr. Oversett, also explained that, quote, it's not possible to construct a perfect system, and there's always a possibility that the system will arc. Every person of ordinary skill in the art who testified before the board, they all agreed on this factual point, and the board properly concluded that one of skill in the art, that skill in the art of plasma physics, would not have understood any of these terms to guarantee the elimination of arcing. Now, Zahn's construction about arcing is also wrong as a matter of what's disclosed in the specification. As the board correctly found, nothing in the specification indicates that no arcing occurs in the formation of a strongly ionized plasma. Let's start with the 716 patent. In column 3, the specification says increasing the power applied to the plasma can increase the probability of generating an electrical breakdown condition. Later in column 3, it talks about reducing the probability of an electrical breakdown condition. In column 6, it talks about forming a weakly ionized plasma first, which substantially eliminates the probability of electrical breakdown condition. In the 716 patent, there's nothing that discloses any apparatus guaranteeing the elimination of arcing. All the discussions in terms of probabilities. 421 specification, same way, always talks about probabilities when discussing arcing. In column 8, column 9, the probability of establishing an electrical breakdown condition when high power pulses are applied is substantially eliminated. Column 15 and 16, the formation of the weakly ionized plasma substantially eliminates the possibility of creating a breakdown condition. You mean probability. Does the spec use it? That one says possibility. Oh, it does say possibility. Yeah. Okay. Can I turn your attention to the final appeal, which deals with the Russian thesis? Yes. And can you tell us precisely what evidence was before the board that we are supposed to use to support its conclusion? Yes. That it was publicly available. First, there's no dispute that the work described in the thesis was the subject, also the subject of an article published by Mosgren in 1995 in the U.S. Scientific Journal Plasma Physics Report. Yeah, but it doesn't have the data. The only thing it's missing, actually, they both have – the only thing Mosgren's thesis was used for was to explain the scale on one figure. Both the article – There's no contention that the article contains the necessary information. That's – we didn't argue that to the board. Right, and that's not what the board – that wasn't the basis for the board. No, because you – with the scale that's provided for the same figure as shown in both the thesis and the article. In the thesis, it has the lines that help show what the scale is. The caption gives you a scale. What do you get out of the article? I'm not understanding what your point is. The article does not have the necessary information in it. That was not argued. And the article, in fact, makes no reference to the thesis either, right? That's correct. But the article does provide, as I think this court has held in the Bruckenmaier case, that it's a guide to somebody who would be able to find the thesis. The article – Wait, wait, wait. How is that a – wait. How is that a guide to the thesis when it doesn't even mention the thesis? Because the article – the thesis is done by the same person, so someone can look up his name. The thesis has the same title, so someone can look up the title to do a search. The thesis has – was catalogued – Well, that's assuming that it was available on the website, on the Russian State Library website. That seems to be your problem. Nobody's contesting that the thesis existed in 1994. Nobody's contesting that if it was on the Russian State Library website that it was publicly available. Nobody's contesting that at some point in time, it became available on the Russian State Library website. The question is, was it available on the website before the priority date? What is the evidence that supports that? Well, the evidence is that the thesis was catalogued and then indexed by author, title, and subject. Now that shows that the Russian State Library had an intent to make it publicly available. You wouldn't do that unless you wanted to – intended to make it available to the public. The question is when, though. Well, if you have an intention to make something available to the public and it's catalogued with a 1994 date, then it seems reasonable to infer, as the board did, that it wouldn't take seven years before that becomes publicly available. I think that's really the key here. The thesis was done seven years before the critical date. The article was six years before the critical date. And so there was the idea that a library that's taking the time to catalog these would not – would wait six or seven years to do that. Why don't you put in some evidence of library practices? I just don't understand. It seems to me you dropped the ball. Well, Your Honor, with respect to this, it's – I mean, frequently there are no – there is no evidence of library practice. If it was in the U.S. Library, I'm sure we wouldn't be having the same argument. People would say it seems likely that this was catalogued and done at the time. Do you have any case that we've ever – where we've reached the conclusion surmising that it would have – wouldn't have taken them seven years to do this? I mean – No, at least the question is whether the evidence was substantial enough for the board to reach that conclusion. And I think it was. The case that my brother cites with respect to – I think it was the – one of the cases that was cited, the issue was whether – the copyright office, this was the one that we were just talking about. And in that case, you couldn't search – you could only search by name and the first word of the title. Here you have the name, you have the complete title, and you have the subject matter, plasma physics, all in the catalog. So regardless of whether this was – when this was put online, the first – our first argument is this was catalogued within – I think the solid inference and that the board properly drew was that it's reasonable to infer that this would have been catalogued within a reasonable time after the date of the thesis. With respect to – Why? Why is it reasonable to infer that? That seems to me to be the hard part. Because there's no reason – no one has ever suggested a reason why a library would wait. What's the evidence that they had the thesis? That it was, in fact, catalogued. There is also the evidence, Your Honor, that Your Honor pointed out before from the card catalog page itself that says a catalog of dissertations in Russian since 1995. I think the reasonable inference for that is this is a catalog that was first created in 1995 and was available thereafter. All of this evidence shows, again, that the Russian State Library intended to make this public, and there's no reason to believe that they would have waited beyond six or seven years to put this into their card catalog. It doesn't make any sense. Even the card catalog looks like it was done on a Russian typewriter. So there are a variety of indicia that suggest that this would have been done at a reasonable time. You have the card catalog. You have, as I said, another indicia of public accessibility is the idea that there is a path to try to find this. And you're correct. The Mosgrin article does not refer explicitly to the thesis. It's the same guy. It's the same title. And one who had that information would be able to figure out, okay, who's this Mosgrin guy, and go and look in the library that seems to be the likely place to find something. He's from the Soviet Union. Let's go look in the Russian State Library. And so I believe with that information was also support the conclusion that this was publicly available. This court has said you don't have to show a specific date that something was cataloged. And we don't have a specific date here. But we do have these other indicia that in other cases this court has found to be sufficient. And I believe for those reasons the Mosgrin thesis does qualify as a printed publication and the board had substantial evidence to make that determination. The case that I was talking about before was the Lister case. And like I said, in that case there was no catalog. There was neither a catalog or indexing. Let me step back. That case said you don't even have to have cataloging or indexing to show public availability. And the Copyright Office in that case did have some cataloging and indexing, but there was only by name and only the first word of the title and not by subject matter at all. If we were talking about a two-year period? No, I don't think it would require that, Your Honor. I think it would be a more difficult argument because we're talking about what's reasonable for the board who's weighing this evidence to believe. And two years makes that reasonableness calculation more challenging, certainly than seven years. But I think seven years, it seems to me there really is no question. And if you're erring on the side of reasonableness and deferring to the board's discretion on this issue, then I believe that seven years, which is the case, makes it sufficient to affirm the board's conclusion on this matter. And I would say that I don't think the Lister case goes on to say that cataloging and indexing are not even a necessary precondition. And certainly we were able to find it. Yeah, in 2014. Well, I understand that, Your Honor, but there isn't any reason to believe that the catalog did not exist. I think the principal point of our argument is that when a library goes to the effort, and many of these cases involve libraries that did not go to the effort of cataloging or indexing, when a library goes to that effort to make a catalog by name, by date, by subject matter, by title, all the additional information that someone would need to track it down, that the reasonable inference for that, which the board drew, is that it was made publicly available within a reasonable time. And that that catalog entry was made within a reasonable time after the thesis was created. And a reasonable time is certainly within six or seven years. Now, with respect to, to just go back for one second to the issue of claim construction, it was argued before you that this language that says minimizes or eliminates is a separate embodiment. And we disagree with that. First, the 155 and the 184 patents, they discuss arcing in only four places. In column five, they discuss what the patent calls a low current regime, and they state that sputtering with discharge voltages greater than a certain amount can be undesirable because they can increase the probability of arcing, similar to the other patents that we talked about. In column 18, the specification talks about the gap that you heard about earlier in figure nine between the anode and the cathode, and states that the gap can reduce the probability that an electrical breakdown condition, i.e. arcing, will develop. And then in column 20, you have the discussion that says the geometry of the gap 514 can be chosen to minimize the probability of arcing. And finally, in column four, where it says the pulse power supply can include circuitry that minimizes or eliminates the probability of arcing. Now, Zahn seizes on half that statement, the words or eliminates, and argues that it means guaranteeing the complete absence of arcing. But that's not what the sentence says. To say that the gap in figure one minimizes or eliminates is not the same as guaranteed elimination. Can I ask you, let's say hypothetically that we were to either construe probability as different than you construe it, or if that language wasn't in the spec, if the spec used the language clearly, there's no possibility of arcing. Would the kind of expert testimony that the board relied on here be sufficient to overcome what is arguably clear language in the claim and clear language in the spec? Well, I think it could be, Your Honor. It's a hypothetical situation, so we'll work with you on the hypothetical. Here, the spec is not at all clear that somebody meant to say there's zero arcing. I just want to find out what we're really resting on here. Is it really expert testimony when there's agreement among the experts, hypothetically, that there's no way this is not going to happen 100% of the time? Is that sufficient to overcome clear claim language and clear specification language? I think if the specification language was different, let me put it this way. We rely on both. If the specification language didn't exist and was clear, and they taught how to guarantee the elimination of arcing, and they said there can never be any arcing, and this will show how you'll never have arcing ever, if that's what the specification taught, it would be a more difficult argument. I think we would probably still say you have to interpret that the way one of ordinary skill in the art would, and you'd have to interpret it in the way that's consistent with the principles of science. The Theracent's case, I think, is a good example. In that case, this court construed a claim term which was fluid, and it was non-flowing manner. The district court had said, well, non-flowing manner means non-flowing manner. The principle basis for this court's conclusion to the contrary was that, well, yeah, but everybody agrees that fluids, like blood in that case, have convective flow. They just do. It's a matter of scientific fact, and so we're not going to read the claim to read out that scientific fact. Well, arguably, this could come up in the context of the district court in an enablement challenge, right? Because if the experts are right and this is impossible to achieve, then it would be an enablement issue with regard to whether that kind of claim is enabled, right? It would be if it was a district court case. That's correct, Your Honor, but obviously the ward did not consider that issue. I think the brief explanation of the science is not very complete. When you're creating the strongly ionized plasma, is there more than one pulse that's used to create that, or is it a single pulse that is used to create it? Well, that's one of the issues that's been raised in the case, and it is whether there's a single pulse or a multiple pulse. There is one pulse that creates the strongly ionized plasma, but the point of that pulse is that it can be additive. In other words, Zahn makes this argument. So when you go through this process, it's a single pulse that creates it? If you actually go through a regular sputtery process in a commercial context, you're going to have multiple pulses, and this process is going to go on for a while. The claim language speaks to a single pulse, yeah. So it would infringe if a single pulse didn't result in arcing, which is possible, but the problem is that in Wang, also a single pulse could be created without arcing. Correct, and Zahn's expert explicitly conceded that, that Wang does show pulses that don't have arcing. And I think that's why Zahn did not adopt his view of Dr. Hertz's view that's expressed in the record about how to construe the claims. But to go back to the issue about Wang, because I think it is one point that's raised in the appellant's brief, which is, does Wang show the single pulse? And the answer is that it does. The board relied on Dr. Erberseth's testimony that properties such as power are additive, which means they can be combined to produce a desired result. And Wang's Figure 6, which is in our brief on page 10, has a background power of PB and a peak power of PP. Background power creates and maintains the weakly ionized plasma, and the peak power, when it's added to the background power, creates the strongly ionized plasma. Now, that is the combination of background power and peak power in Wang's Figure 6 produces a waveform, and that waveform is exactly the same as what's shown in Figure 6 of the 421 patent. And that's also shown in the board's decision. And Zahn himself agreed that in the 421 patent, the claimed power supply increases its power output to transition from a weakly ionized plasma to a strongly ionized plasma. It's exactly what Wang does, and substantial evidence supports the board's conclusion on that point. Now, Your Honor, in conclusion, I would say that, to put this appeal in context, the PTAB reviewed 371 claims of 10 Zahn patents and 35 IPRs. They exhaustively addressed the issues, often dealing with a moving target in terms of Zahn's theories and arguments. And for reasons that I've explained and for reasons that are set forth in our brief, we believe the decision below should be affirmed. Unless the court has any further questions. I have one other question. Hypothetically, if we were to disagree with you about the public availability of the thesis, are there other grounds for invalidation of the three or four claims that we're talking about that weren't reached by the board? Well, we believe that the Mosman article itself would also invalidate those claims. And if this court decided that the thesis was not available, then one way of resolving that would be to send it back and allowing the board to consider that. As I said, the only thing that was... Did you argue that before the board? We didn't, and I'll tell you why. The reason that we didn't is because, again, Zahn's... The Mosman thesis was only used for one single point. There's a figure 3B that shows a graph. And that graph has, in the caption, it's got a scale. And it's in a syllogram, and it shows various lines on the graph. So you can use what's in the caption and use... Because it says how many volts per division, et cetera. So you can use those lines to precisely calculate what you need to calculate for purposes of those four claims where the Mosman thesis is an issue. That same figure is in the Mosman article. And it has... It's exactly the same figure. It's got exactly the same scale. The only thing that's missing from it are those lines. And the lines allow you to make a precise calculation. And that's what we did. We made the precise calculation. But you could take almost any reasonable view of what that scale is, like it's all one division or it's multiple divisions. And we believe they would all still produce the same result. They would still produce a mathematical result that's within the scope of those four dependent claims. So that's the only reason the Mosman thesis was used. We didn't make that argument below because we wanted to make the precise argument. But certainly that was... You didn't make the argument because you wanted to make it more precise? What prevented you from making it as an alternative argument? Well, there was no reason to make an alternative argument. At the time, and remember that Zahn's position on the Mosman thesis has changed. It started off by saying, well, it's in Russia, and so it's not publicly available. And the board, relying on cases from this board, said, no, just because it's in a foreign country does not, by default, make it not publicly available. And Zahn's next argument was, well, but that 1994 date, that's not really 1994. That could be a date that just somebody put on there at the imprint date. And the board reached that argument and said, well, no, imprint in common parlance means the date of publication. And we believe that's what it means here. So it was only very late in the proceedings where Zahn raised this argument. And at that point, all of the expert declarations were already in. The petitions had already been drafted. And because the calculation from the Mosman thesis was precise, it didn't have any speculation about how you should do the scale. It seemed to us the best way to approach that. Had we known at the beginning all of the arguments that Zahn was going to raise, I'm sure we would have done it that way. But we didn't do it that way, and I think it would be manifestly unfair in these circumstances to exclude us from being able to do that on remand. Thank you. Thank you. Your Honors, there was discussion with the appellee concerning the issue of a single pulse versus multiple pulse. And this goes to the heart of the claims in the 421 patent, which are somewhat different than the claims that we discussed earlier concerning 155. Claims in the 421 patent, this is the subject of the 1423 bill. Without an occurrence of arcing. Now, the board read that to mean that, well, the without occurrence of arcing language only applies to the strongly ionized plasma. And that's simply incorrect. This claim is speaking to a single pulse creating both the weakly ionized plasma and the strongly ionized plasma, both without the occurrence of arcing. We know this because the use of the word and indicates that it is both plasmas that are affected by the creation. And the phrase without an occurrence of arcing is how that creation is done. That's the prepositional phrase that modifies the term create. So this is a rather different claim than the one we looked at earlier. And here, the contract with Wang is even more striking. There was reference to Wang's figure six embodiment. But even the petitioner's own expert testified that Wang does not show the creation of the weakly ionized plasma in the ignition phase. In fact, this is in the 1423 appendix at pages 68, 37, and 38. And the figure is reproduced in our brief for that appeal at page 47. The annotations that appear are those of the petitioner's expert. And you can see that the figure doesn't even speak to the ignition phase and the creation of the weakly ionized plasma. And the expert himself has indicated that, well, yeah, during that phase, there may be arcing. So the claims in 421 are even further away from what is taught by Wang than what we spoke of earlier. Your Honors, if we were to hypothetically rule in your favor on the public availability of the thesis, should we, as to these three or four claims, should we reverse or remand? You should reverse, Your Honor. That was the only evidence relied upon below. It was the only evidence that the board's decision spoke to. And since if the Moskvin thesis is not available as prior art, the finding of the patent— When was this publicly available argument raised for the first time in the proceeding? It was initially raised in the patent owner's preliminary response and raised again in the patent owner's response. No, but, I mean, the specific argument we're talking about now, I mean, apparently you first argued that it wasn't publicly available because it was in Russia, right? That was included, but we also argued it was not publicly available because of the lack of evidence by the petitioner. Where is that in the appendix? Let me find it for you. Okay. Okay. I'm looking, Your Honor, in the appendix for the 1423 appeal, page 514. And we indicate in that paragraph that's excerpted from our response that neither the petition nor the board's institution decision demonstrates the thesis was disseminated or otherwise made available. The board found the thesis was prior art based upon an imprint date appearing on a catalog entry. However, petitioners provided no evidence. The phrase Moskvin 1994 means the Moskvin thesis was cataloged on that date. And then there's the argument about Russia, which we're not raising here. Okay. Your Honors, really that was what I wanted to bring to your attention. I'm happy to take any further questions. Otherwise, we'll trust the matter to your sound judge. Thank you. Thank you. We thank both sides and the cases are submitted. That concludes our proceedings.